IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHARLES A. SINGLETON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02: 02cv1312 |
| | ) | |
| MELLON FINANCIAL CORPORATION, | ) | |
| a Pennsylvania Corporation; MELLON BANK, | ) | |
| N.A., A National Association Held by | ) | |
| MELLON FINANCIAL CORPORATION; | ) | |
| MARTIN G. McGUINN, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

September 29, 2005

Presently before the Court for review and disposition are the following:

• MOTION FOR SUMMARY JUDGMENT, with brief in support filed by Defendants Mellon Financial Corporation, Mellon Bank, N.A., and Martin G. McGuinn (*Document Nos. 84 and 85, respectively*);

• Brief and Response in Opposition to Defendants' Motion for Summary Judgment filed by Plaintiff (*Document Nos. 89 and 90*);

• Reply Brief in Further Support of Their Motion for Summary Judgment filed by Defendants (*Document No. 95*);

• Supplemental Brief in Opposition to Defendants' Motion for Summary Judgment filed by Plaintiff (*Document No. 100*); and

• Reply to Plaintiff's Supplemental Brief in Opposition to Defendants' Motion for Summary Judgment filed by Defendants (*Document No. 103*).

After careful consideration of Defendants' motion for summary judgment, the filings in support and opposition thereto, the briefs of the parties, the relevant case law, and the record as a whole, the Court finds that there is not sufficient record evidence upon which a reasonable jury could return a verdict for Plaintiff, Charles A. Singleton, on his federal and state claims of disability and race discrimination.  Therefore, the Court will grant Defendants' motion for summary judgment as to all federal and state claims which allege discrimination and dismiss without prejudice the Counterclaims alleged by Defendants Mellon Financial Corporation and Mellon Bank, N.A.

## BACKGROUND

Construed in the light most favorable to the Plaintiff, the record facts are as follows:

On January 4, 1999, Defendant Martin G. McGuinn, the Chief Executive Officer of Mellon Financial Corporation and Mellon Bank, N.A., contacted Thomas Flannery of the search firm, Resources for Management, Inc. ("RFM") to search for a new Executive Vice President of Human Resources for Mellon Bank, N.A.  Defendant McGuinn explicitly requested that Mr. Flannery make a special effort to locate qualified female and minority candidates.  Mr. Flannery contacted Plaintiff, Charles A. Singleton, who expressed interest in the Mellon opening and faxed his resume to Mr. Flannery's office.  In his resume, Plaintiff represented that he was employed at the time by the Eastman Kodak Company ("Kodak") as the Vice President of Corporate Human Resources, Director of Worldwide Compensation & Benefits.  Plaintiff also represented in his cover letter to Mr. Flannery that he was then a current Kodak employee.

On February 27, 1999, Plaintiff had his initial interview with Mr. Flannery, at which time he presented Mr. Flannery with a second resume. Although this resume was formatted differently, Plaintiff continued to represent himself as a "then current" employee of Kodak.

Mr. Flannery presented a number of candidates to Mellon, but two emerged as "the strongest of the bunch" - Plaintiff and James Alef.

Defendant McGuinn interviewed Plaintiff on March 15, 1999. After interviewing both Plaintiff and James Alef, Defendant McGuinn determined to offer Plaintiff the position of Executive Vice President of Human Resources for Mellon. Defendant McGuinn then called Plaintiff to outline an offer of employment and asked Mr. Flannery to convey the details of the offer to Plaintiff.

As instructed, Mr. Flannery conveyed the offer to Plaintiff, who "came back and said he wanted more and different things . . . both in terms of money and replacing certain things he had at Kodak . . . ." Defs' Stmt of Material Undisputed Facts, at ¶ 23. In particular, Plaintiff represented to Mr. Flannery, inter alia, that (i) he was at that time earning $175,000 at Kodak and that was to increase to $200,000 in June 1999; (ii) he would be receiving an $80,000 bonus from Kodak that he would have to forfeit if he left Kodak; (iii) he had a $700/month car allowance from Kodak that reimbursed him for his car lease payments; (iv) he had Kodak stock options in the amount of $165,000 that he would lose if he departed Kodak; and (v) he had an interest-free loan from Kodak in the amount of $125,000 that he would have to repay upon his departure from Kodak.

In response, on April 20, 1999, Defendant McGuinn revised his offer to Plaintiff to include reimbursement for the following losses Plaintiff alleged he would incur: (i) $165,000 - to replace

Plaintiff's alleged lost gains on Kodak stock options; (ii) $125,000 - to enable Plaintiff to repay his loan from Kodak; and (iii) $80,000 - to replace Plaintiff's alleged loss of a 1998 Kodak bonus.

On April 25, 1999, Plaintiff accepted Mellon's revised offer of employment. On June 14, 1999, Plaintiff commenced his employment with Mellon Bank, N.A. as Executive Vice President of Human Resources and at all times was an at-will employee. In this position, Plaintiff reported directly to Defendant McGuinn and was a member of Mellon's Senior Management Committee. Plaintiff was responsible for all aspects of Mellon's human resources policies, procedures and initiatives and had numerous direct reports of his own. Defendant McGuinn testified that he hired Plaintiff specifically "to undertake leadership of major changes to human resources capabilities and delivery." Defs' Stmt of Material Undisputed Facts, at ¶ 30.

Defendant McGuinn testified that as of the fall of 1999, he was becoming increasingly dissatisfied with the lack of progress that Plaintiff was making in the Human Resources department and "ask[ed] [Plaintiff] about his review of the people and the department and what his plans were. And he had not yet really developed those plans. I asked about his progress on various initiatives, trying to impress on him the urgency that was needed." McGuinn Depo. at 13-14. Defendant McGuinn also testified that he noted that Plaintiff tended to schedule his personal appointments in the middle of the day and "he wouldn't come in beforehand or he couldn't come back to the office after it." *Id.* at 15.

Mr. Flannery testified that Defendant McGuinn voiced his dissatisfaction with Plaintiff's performance to him "almost from the outset [and] certainly within three to six months of his employment because [Plaintiff] was not performing to Mr. McGuinn's standards." Flanery Depo. at 91.

4

In December of 1999, Defendant McGuinn gave Plaintiff a favorable rating, based upon his six months performance, but noted Plaintiff "should build [a] greater sense of urgency in people working for him." Singleton Depo. Exh. 31.

In March of 2000, Plaintiff had back surgery and took a leave of absence to recuperate from his surgery. Plaintiff contends that during his recuperation, he had a fax machine installed at his home dedicated to Mellon, as well as a lap top computer dedicated to the Mellon Local Access Network, which enabled him to work from home every day during his leave of absence.

Plaintiff returned to work on July 17, 2000, without restrictions that would have prevented him from performing his job. On the day of his return, Plaintiff met with Defendant McGuinn, who informed Plaintiff that he needed to be more visible in the human resources department, particularly in Pittsburgh, and that it was taking "too long" for him to make the necessary changes within the human resources department. In response, Plaintiff acknowledged that implementing changes in the human resources department was taking "longer than [he or Defendant McGuinn] . . . would like" and Plaintiff also acknowledged that his alleged difficulties in scheduling meetings due to conflicting work schedules were, as Defendant McGuinn suggested, "no excuse." Singleton Depo. Exh. 32.

Defendant McGuinn met with Plaintiff again in August of 2000. At that meeting, Defendant McGuinn discussed an interim performance appraisal he had prepared for Plaintiff in which he rated Plaintiff a "marginal" performer. Plaintiff contends that Defendant McGuinn did not discuss specifics with him during this meeting, but rather "alleged simply that everything Plaintiff was doing was going wrong. . . ." Pl's Stmt of Material Undisputed Facts, at ¶ 68.

On January 30, 2001, Defendant McGuinn met with Plaintiff for his first full-year performance evaluation at which time Defendant McGuinn noted that Plaintiff had made some improvements since his discussions with him in the summer of 2000. However, notwithstanding these improvements, Defendant McGuinn noted that with respect to two of Plaintiff's four specific department priorities - establishing a methodology to track turnover and recruiting and reengineering the human resources process - Plaintiff had made little progress over the span of his year employment.

In August of 2001, Defendant McGuinn again met with Plaintiff for a mid-year review. During this meeting, Defendant McGuinn explained that "[he] was getting more disappointed by [Plaintiff's] sub-par performance and told him that, at best, he was a 'meets target,' which is [Mellon's] third rating, so he was actually declining from where he was." McGuinn Depo. at 137-138. Defendant McGuinn testified that it became more and more apparent to him that Plaintiff "just wasn't getting all of the things done that he was supposed to be getting done in a timely manner" and that "he was not providing sufficient leadership in the HR Department." *Id*. at 139.

In September of 2001, Defendant McGuinn made the decision to terminate Plaintiff's employment and did so.

On July 26, 2002, Plaintiff commenced this action by filing a Complaint in which he contends that Defendants unlawfully terminated his employment because he was disabled under the Americans with Disabilities Act ("ADA") and/or because of his race (African-American).

In June of 2003, Mellon received correspondence from the custodian of records of Kodak, in response to a subpoena for documents, which indicated that Plaintiff had worked for Kodak

only until November 30, 1997, contrary to Plaintiff's representations that he was employed by Kodak in April 1999.

Thereafter, on May 12, 2004, Defendants Mellon Financial Corporation and Mellon Bank, N.A., filed counterclaims for "fraud and conversion against Plaintiff based upon alleged various fraudulent misrepresentations he made to Mellon in 1999 and based upon which he was not only given a job but was also given large sums of money." Defs' Br. at 2.

Defendants have filed the instant motion for summary judgment, in which they contend that Plaintiff is unable to establish a *prima facie* case on either his ADA and/or Title VII claim. Further, Defendants seek summary judgment on their counterclaims for fraud and conversion. Not surprisingly, Plaintiff vigorously opposes the motion for summary judgment.

## STANDARD OF REVIEW

A court may grant summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" only if its existence or non-existence would affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). An issue of fact is "genuine" only when there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party regarding the existence of that fact. *Id.* In determining whether there exist genuine issues of material fact, all inferences must be drawn, and all doubts must be resolved, in favor of the non-moving party. *Coregis Ins. Co. v. Baratta & Fenerty, Ltd.*, 264 F.3d 302, 305-06 (3d Cir. 2001) (*citing Anderson*, 477 U.S. at 248).

Although the moving party bears the burden of demonstrating the absence of a genuine issue of material fact, in a case such as this, where the non-moving party is the plaintiff and, therefore, bears the burden of proof at trial, that party must present affirmative evidence sufficient to establish the existence of each element of his case. *Id.* at 306 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Accordingly, a plaintiff cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid the entry of summary judgment, *see Celotex*, 477 U.S. at 324, but rather, the plaintiff "must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial," *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000).

## DISCUSSION

I. **Disability Discrimination Claims**[1]

Defendants argue, *inter alia,* that Plaintiff does not suffer from a "disability" as that term is defined in the ADA and/or the PHRA and, thus, his disability claims necessarily must fail.[2]

---

[1] In his Third Amended Complaint, Plaintiff suggests that his disability discrimination claims are actionable under 42 U.S.C. § 1981. However, Section 1981 liability "does not extend to discrimination based on disability." *Davis v. Polyscience, Inc.*, 126 F. Supp. 2d 391, 393 (E.D. Pa. 2001); *see also Aramburu v. Boeing Co.*, 112 F.3d 1398, 1411 (10th Cir. 1997); *Duane v. Gov't Employees Ins. Co.*, 784 F. Supp. 1209, 1216 (D. Md. 1992), *aff'd*, 37 F.3d 1036 (4th Cir. 1994). The Court notes that Plaintiff has not disputed Defendants' argument that his Section 1981 claims are without merit. Accordingly, all disability discrimination claims brought by Plaintiff under Section 1981 will be dismissed.

[2] Pennsylvania courts generally interpret the PHRA in accordance with its federal counterparts. *See Kelly v. Drexel Univ.*, 94 F.3d 102, 104 (3d Cir. 1996). Therefore, the disposition by the Court of Plaintiff's ADA claim applies with equal force to his PHRA disability claim. *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375 (3d Cir. 2002).

For Plaintiff to prevail on his discrimination claims, he must demonstrate that: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he had suffered an otherwise adverse employment decision as a result of discrimination. *See Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3d Cir.1998) (*citing Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir.1996)).

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 193 (2002). Under the ADA, a "disability" is:

> (A)    a physical[3] or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B)    a record of such impairment; or
>
> (C)    being regarded as having such impairment.

42 U.S.C. § 12102(2); *Toyota Motor*, 534 U.S. at 193.  As neither the allegations nor arguments of Plaintiff address the second or third prongs of the ADA definition of disability, the disposition of the present motion depends upon whether Plaintiff has established sufficient evidence for any reasonable jury to conclude that he suffers from a physical or mental impairment that substantially

---

[3]    A "physical impairment" is "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems:  neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin and endocrine." 29 C.F.R. § 1630.2(h).

limits one or more of his major life activities. *Toyota Motor*, 534 U.S. at 195 (citing 42 U.S.C. § 12102(2)(A)).

The ADA does not specifically define "major life activities." However, the EEOC regulations define the term as those activities that are of "central importance to most people's daily lives." 45 C.F.R. § 84.3(j)(2)(ii); *Toyota Motor*, 534 U.S. at 197. This means "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 45 C.F.R. § 84.3(j)(2)(ii). The Court of Appeals for the Third Circuit has "held only extremely limiting disabilities - in either short or long-term -- to qualify for protected status under the ADA." *Marinelli v. City of Erie, Pennsyvlania*, 216 F.3d 354, 362 (3d Cir. 2000).

In *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), the United States Supreme Court stated that under the ADA:

> A "disability" exists only where an impairment "substantially limits" a major life activity, not where it "might," "could," or "would" be substantially limiting if mitigating measures were not taken. A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently "substantially limits" a major life activity. To be sure, a person whose physical or mental impairment is corrected by mitigating measures, still has an impairment, but if the impairment is corrected it does not "substantially limi[t]" a major life activity.

*Id.* at 482-83 (emphasis added).

The Court of Appeals for the Third Circuit has also given direction on whether an impairment "substantially limits" a major life activity: "[An] impairment must not only affect the way in which the plaintiff engaged in [a major life activity] . . . . To the contrary, a plaintiff must establish that the impairment <u>substantially limits</u> the ability to engage in the activity." *Marinelli*, 216 F.3d at 361 (emphasis in original). For example, in *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 186-87 (3d Cir. 1999), our appellate court found that a plaintiff who could stand or walk for

10

only fifty minutes at a time was not disabled under the ADA. Similarly, in *Kelly v. Drexel University,* 94 F.3d 102, 108 (3d Cir. 1996), the court of appeals found that a plaintiff who had a hip fracture and noticeable limp, and could not walk more than a mile without stopping, had a "comparatively moderate restriction [ ] on the ability to walk" and, therefore, had no disability.

Plaintiff contends that his back condition is a "significant disability that substantially limits his ability to perform the major life activity of walking." P's Br. at 3. Plaintiff testified that he has persistent pain and leg weakness. It is not disputed that Plaintiff continues to have "problems with walking, " his gait is "not normal," and he experiences persistent pain. However, it is also not disputed that following his surgery, Plaintiff was able to do the following activities:

- care for himself, including dressing and showering; *See* Depo. of Carol Singleton at 18;

- drive an automobile without accommodations, although he does utilize a disabled parking sticker for his vehicle; *Id.*; *see also* Depo. of Charles Singleton at 154;

- exercise on a treadmill and recumbent bike for nearly an hour, three days a week and is encouraged by his physician to exercise as much as he can; *see* Carol Singleton depo. at 16, 20;[4]

- attend the movies and his son's extracurricular events; *see* Depo. of Charles Singleton at 164; and

- return to work on July 17, 2000, with the only restrictions being that he was unable to lift over ten pounds and that he could not engage in prolonged standing.[5]

---

[4] The treadmill is equipped with arm supports, which Plaintiff uses to steady himself. "He usually goes about a half mile on the treadmill. This distance is covered in 35-45 minutes." Pl's Counter-Stmt of Material Disputed and Undisputed Facts, at ¶ 51.

[5] According to Plaintiff, "it was necessary for Mr. Singleton to engage in positional changes frequently" and that he "returned to work using a handicap parking sticker." Pl's Counter-Stmt of Material Disputed and Undisputed Facts, at ¶ 58.

The Court finds and rules that although Plaintiff's impairment certainly "affects" his ability to walk, the impairment does not "substantially limit" his ability to engage in this activity. Plaintiff's inability to engage in prolonged walking is even less restrictive than those which the appellate courts of the Third Circuit already found did not substantially limit a major life activity in *Taylor* and *Kelly*. Because Plaintiff's impairment does not substantially limit his ability to engage in a major life activity, the Court finds and rules that Plaintiff has not met the first element of his *prima facie* case and, therefore, is not disabled under the ADA and/or the PHRA.

II.     **Race Discrimination Claims**[6]

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ." 42 U.S.C. § 2000e-2(a)(1). Thus, a court's ultimate task in a race discrimination case is to determine whether the plaintiff has carried his burden of showing, by a preponderance of the evidence, that the employer intentionally discriminated against him. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir.1993); *see Bellissimo v. Westinghouse Elec. Corp.*, 764 F.2d 175, 179 (3d Cir.1985) ("[A] plaintiff must show that his status as a minority class was the but for reason for the treatment accorded."), *cert. denied*, 475 U.S. 1035 (1986).

---

[6] Because Pennsylvania courts generally interpret the PHRA in accordance with its federal counterparts, the disposition by the Court of Plaintiff's Title VII claim applies with equal force to his PHRA disability claim. *See Kelly v. Drexel Univ.*, 94 F.3d 102, 104 (3d Cir. 1996). In his Third Amended Complaint, Plaintiff also alleges a race claim under 42 U.S.C. § 1981. The analysis for a Section 1981 claim is identical to the analysis of Plaintiff's Title VII race claims; therefore, the Court will treat coextensively Plaintiff's Title VII claims and his Section 1981 claims.

In a Title VII lawsuit, the familiar *McDonnell Douglas* formulation[7] regarding the appropriate burdens of proof and allocation of production of evidence govern and guide the analysis of the evidence presented on a motion for summary judgment. Accordingly, the plaintiff bears the initial burden of presenting a *prima facie* case by demonstrating that (1) he is a member of a protected class; (2) he was qualified for the job; (3) he suffered an adverse employment decision; and (4) others not in the protected class were treated more favorably. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994) (*citing McDonnell Douglas*, 411 U.S. at 802). Should the plaintiff make this showing, a presumption of discrimination is created and the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its decision. *Fuentes*, 32 F.3d at 763; *Weldon v. Kraft, Inc.*, 896 F.2d 793, 797 (3d Cir.1990).

The employer need only produce sufficient evidence to enable a factfinder to conclude that the action taken was motivated by a nondiscriminatory purpose. *Fuentes*, 32 F.3d at 763. If the defendant is able to clear this relatively low hurdle, the presumption evaporates and the onus is again on the plaintiff, who bears the ultimate burden of showing that a discriminatory purpose was a determinative factor in the decision. *Id*. at 764; *Bellissimo*, 764 F.2d at 179-80. The plaintiff can either prove this directly, by showing that discriminatory considerations motivated the defendant's actions, or indirectly, by showing that the rationale provided by the defendant is unworthy of credence. *Josey*, 996 F.2d at 638; *Weldon*, 896 F.2d at 797.

At trial, a Title VII plaintiff must prove both that the employer's reason was false and that discrimination was the real reason for the discharge. *Fuentes*, 32 F.3d at 763. However, the Court of Appeals for the Third Circuit has held that the plaintiff's burden is not as onerous when

---

[7]   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

13

attempting to survive a summary judgment motion. In such situations, the plaintiff need only demonstrate that there are disputed factual issues concerning either (1) whether the proffered reason for the discharge is false, or (2) whether an invidious discriminatory reason was more likely than not a motivating or determinative cause for the discharge. *Torre v. Casio, Inc.,* 42 F.3d 825, 830 (3d Cir. 1994); *Fuentes*, 32 F.3d at 764.

For purposes of this decision, the Court will presume that Plaintiff has met his *prima facie* case. Therefore, the burden shifts to Defendants to articulate some legitimate, nondiscriminatory reason for its decision. Defendants argue that legitimate reasons exist for its decision to terminate Plaintiff's employment. For example, Defendants contend that Plaintiff was having difficulty meeting Defendant McGuinn's expectations for the position of Executive Vice President of Human Resources. By Plaintiff's own admission, Plaintiff's progress with the Employer of Choice initiative was slow and he too was disappointed with his own slow progress.

By the time of Plaintiff's mid-year review in August of 2001, Defendant McGuinn explained that "[he] was getting more disappointed by [Plaintiff's] sub-par performance and told him that, at best, he was a 'meets target,' which is [Mellon's] third rating, so he was actually declining from where he was. And . . . [they] talked about a lot of issues around that." Defs' Stmt of Mat. Undisputed Facts, at ¶ 89.

Further, Defendant McGuinn testified that Plaintiff had failed to motivate his subordinates in the Human Resources Department.

Because Defendants have articulated a legitimate, non-discriminatory reason for their decision to terminate Plaintiff's employment, the onus shifts back to Plaintiff to show, by a

preponderance of the evidence, that Defendants' stated explanation is pretextual. *Fuentes*, 32 F.3d at 763.

Plaintiff responds that "[t]here are significant contradictions or discrepancies in the evidence presented by Defendants witnesses with regard to why Mr. Singleton was fired, that cast doubt upon the Defendants' proffered reason for terminating Plaintiff." Pl's Br. at 17. For example, Plaintiff argues that Defendant McGuinn "could not identify a single time frame for any of the objectives that he felt Singleton was not meeting quickly enough." *Id*. at 18. Further, although Plaintiff concedes that upon his return from medical leave Defendant McGuinn met with him and expressed his "displeas[ure] with his performance," Plaintiff contends that Defendant McGuinn "gave no specifics about his displeasure." *Id.* at 19.

The Court, however, finds and rules that the record upon which summary judgment is to be determined is utterly devoid of any evidence which demonstrates that Plaintiff's race was a factor in Defendants' decision to terminate his employment. Plaintiff relies upon his own "unsupported assertions, conclusory allegations, or mere suspicions." For example, when Plaintiff was asked during his deposition why he thought he was terminated because of his race, he replied:

> [T]here were at least - - at least-- six, seven members of the senior management committee who was retained and/or promoted with the same or lesser performance ratings in the same two-year period as I had . . . .
>
> That's a very strong statement, I think, and the 150-year history of Mellon never having anybody on the senior management committee previously I think was another one. And I also say to you that just because Mr. McGuinn decided to have one for some limited period of time, being a person of color on the senior management committee, doesn't mean that his intentions were pure in that regard at all. I think there has been many, you know, instances in corporate America where that could be proven as such. . . . It's called tokenism.
>
> That he, as CEO, would, as I think I just said, for some period of time have a person of color at the senior management committee level, utilize that to make himself

perhaps look somewhat enlightened, and for whatever reasons, then have that situation -- that scenario terminated and be able to say, well, at least I tried.

Pl's Depo. at 196.

The Court finds and rules that Plaintiff has simply failed to present any evidence to establish that race was a factor in Defendants' decision to terminate him. Plaintiff's disagreement with Defendants' employment decision is insufficient to survive summary judgment. *See Fuentes v. Perski,* 32 F.3d 759, 765-66 (3d Cir. 1994) ("plaintiff cannot simply show that the employer's decision was wrong or mistaken"; "These criticisms amount to little more than the schoolyard retort, 'Not so,' an approach which . . . does not create a material issue of fact.").

Therefore, the Court will grant the summary judgment motion filed by Defendants on Plaintiff's Title VII claim of race discrimination.

III.   **Counterclaims for Fraudulent Misrepresentation and Conversion**

Defendants Mellon Financial Corporation and Mellon Bank, N.A. have filed a Counterclaim against Plaintiff for fraudulent misrepresentation and conversion based upon alleged "misrepresentations" Plaintiff made to Mellon in his resume and in subsequent communications. This Court has supplemental jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1367(a) and Rule 13 of the Federal Rules of Civil Procedure.

Supplemental jurisdiction is a doctrine of discretion, not of plaintiff's right. *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995). If the claims over which a district court has original jurisdiction are dismissed, the district court has the option of declining to exercise supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(c)(3). In

determining whether to dismiss the state law claims, the district court should consider whether state law claims involve issues of federal policy and whether either party will be prejudiced by the dismissal of the state law claims. *Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277, 1284 (3d Cir. 1993).

Defendants' state law claims for fraudulent misrepresentation and conversion do not involve issues of federal policy. Further, Pennsylvania law provides that matters dismissed by a federal court for lack of subject matter jurisdiction may be refiled in the appropriate state court without regard to the limitations period. 42 Pa. Const. Stat. Ann. § 51.03(b); *Fulkerson v. City of Lancaster*, 801 F. Supp. 1476, 1486 n.3 (E.D. Pa. 1992), *aff'd,* 993 F.2d 876 (3d Cir. 1993). Therefore, Defendants will not be prejudiced with respect to the applicable limitations period if they choose to refile their lawsuit in state court. Accordingly, the Court will exercise its discretion and dismiss without prejudice the Counterclaim of the Defendants.

## CONCLUSION

Viewing the facts in the light most favorable to the Plaintiff, the Court finds that there is not sufficient record evidence upon which a reasonable jury could return a verdict for Plaintiff on his federal and state claims of disability and race discrimination. Accordingly, summary judgment will be granted on Plaintiff's claims of disability and race discrimination. Defendants' counterclaims under Pennsylvania state law for fraudulent misrepresentation and conversion will be dismissed without prejudice.

McVerry, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHARLES A. SINGLETON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02: 02cv1312 |
| | ) | |
| MELLON FINANCIAL CORPORATION, | ) | |
| a Pennsylvania Corporation; MELLON BANK, | ) | |
| N.A., A National Association Held by | ) | |
| MELLON FINANCIAL CORPORATION; | ) | |
| MARTIN G. MCGOWAN, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER OF COURT

AND NOW, this 29th day of September, 2005, in accordance with the foregoing Memorandum Opinion, it is **ORDERED**, **ADJUDGED, AND DECREED** as follows:

1.     The Motion For Summary Judgment filed by Defendants Mellon Financial Corporation; Mellon Bank, N.A., and Martin G. McGuinn is **GRANTED** as to all claims of alleged disability discrimination in violation of the Americans with Disabilities Act and the Pennsylvania Human Relations Act;

2.     The Motion For Summary Judgment filed by Defendants Mellon Financial Corporation; Mellon Bank, N.A., and Martin G. McGuinn is **GRANTED** as to all claims of alleged race discrimination in violation of Title VII and the Pennsylvania Human Relations Act; and

3. The Pennsylvania state law claims of Defendants Mellon Financial Corporation and Mellon Bank, N.A., for fraudulent misrepresentation and conversion are dismissed without prejudice forthwith.

BY THE COURT:

<u>s/Terrence F. McVerry, Judge</u>
United States District Court

cc: Courtney E. Morgan, Jr., Esquire
Morgan & Meyers
3200 Greenfield
Suite 260
Dearborn, MI 48120

John W. Murtagh, Esquire
Murtagh & Cahill
Email: murtaghandcahill@zoominternet.net

Cathy Bissoon, Esquire
Reed Smith
Email: cbissoon@reedsmith.com

John C. Unkovic, Esquire
Reed Smith
435 Sixth Avenue
Pittsburgh, PA 15219-1886

Robert F. Prorok, Esquire
Reed Smith
Email: rprorok@reedsmith.com